# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 5991 | DATE | 3/25/2003 |
| CASE TITLE | R.J. O'Brien & Associates, Inc. vs. Susan Vierstra, et al. | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment [17-1] is granted with respect to defendant Susan Vierstra but denied with respect to defendant Michael Vierstra. Plaintiff is awarded $101,852.41, plus interest, and reasonable costs and attorneys' fees; plaintiff may file a petition for fees and costs in accordance with the local rules of this district.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | MAR 27 2003 | |
| ✓ | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT | docketing deputy initials | |
| ✓ | Mail AO 450 form. | CLERK | | |
| | Copy to judge/magistrate judge. | 03 MAR 26 PM 2:35 | date mailed notice | |
| RK | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

R.J. O'BRIEN & ASSOCIATES, INC., )
)
                Plaintiff, )   No. 01 C 5991
v. )
)
SUSAN VIERSTRA, et al. )   Judge Joan B. Gottschall
)
              Defendants. )

## MEMORANDUM OPINION & ORDER

Plaintiff R.J. O'Brien & Associates, Inc. ("RJO"), a registered futures commission merchant, seeks summary judgment against defendants Susan Vierstra and her husband Michael Vierstra for the deficit balance presently due on a futures trading account opened in Mrs. Viestra's name. For the reasons explained below, RJO's motion for summary judgment is granted with respect to Mrs. Vierstra but denied with respect to Mr. Vierstra.

### Summary Judgment Standard & Local Rule 56.1

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the movant sets forth its argument, properly supported by the record, that there is no genuine issue of material fact that requiring trial, the burden shifts to the nonmovant to identify specific facts that preclude summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Additionally, in cases pending in this district, all parties must comply with Local Rule 56.1 which governs motions for summary judgment. Local Rule 56.1 requires the movant to file a statement of material facts demonstrating why the movant believes it is entitled to judgment as a matter of law. This statement "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a)(3). The opposing party must respond to each numbered paragraph in the movant's L.R. 56.1(a)(3) statement. L.R. 56.1(b)(3). If the opposing party contests any fact set forth by movant, the opposing party must expressly state its disagreement and include "specific references to the affidavits, parts of the record, and other supporting materials" that establish the basis for the disagreement. *Id.* "All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Id.* The opposing party may also file a statement of any additional material facts demonstrating why summary judgment cannot be granted. *Id.* If the movant fails to properly controvert those additional material facts, they are also deemed admitted. L.R. 56.1(a)(3).

Here, RJO properly filed its L.R. 56.1(a)(3) statement of material facts, but the Vierstras failed to respond. As a result, all of the material facts set forth in RJO's L.R.56.1(a)(3) statement ("RJO SUF") are deemed admitted, provided they are properly supported by the record. L.R. 56.1(b)(3); *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 567 (7th Cir. 1992).

The Vierstras did file a document entitled "Statement of Disputed Facts of Michael Vierstra and Susan Vierstra" ("Vierstra SDF"), but they failed to comply with L.R. 56.1(b)(3) in doing so. The statement includes both facts and legal argument, not all facts are properly

2

supported by citations to the record, and in certain instances, although there is a reference to the record, the reference is not specific. For example, the Vierstras state that their deposition transcripts show the existence of a disputed issue of fact, (Vierstras' SDF at ¶ 5), but there are no references to page and line numbers. And as expressly stated in this court's standing order, "a reference to a transcript that does not include the page and line numbers is not a specific reference. The court will not search a multi-page document [or] guess as to which language in a document the party relies upon." Standing Order Regarding Mot. Summ. J., Oct. 14, 1999 (Gottschall, J.) To the extent that the Vierstras' SDF actually sets forth facts, as opposed to legal argument, and to the extent the court is able to determine whether there is proper factual support, the court will consider the SDF, despite the Vierstras' failure to comply with the local rules. The court further notes that RJO failed to respond to the Vierstras' SDF. This is of little consequence because, as explained below, RJO argues that even accepting the Vierstras' claims as true, RJO is entitled to judgment as a matter of law.

### Factual Background

RJO is a futures commission merchant registered with the Commodity Futures Trading Commission ("CFTC") and a clearing member of the Chicago Mercantile Exchange ("CME"). The Vierstras jointly own a dairy farm in Twin Falls, Idaho. On September 26, 2000, Mrs. Vierstra opened a futures trading account with RJO ("Vierstra account"). Although only Mrs. Vierstra executed the Account Agreement, both Mr. and Mrs. Vierstra were authorized to trade in the Vierstra account, and were authorized to receive and respond to margin calls related to the Vierstra account. All of the trades made in the Vierstra account were in milk futures contracts.

3

*The Account Agreement*

When Mrs. Vierstra opened the Vierstra account, she signed an account agreement (the "Account Agreement"). Under the express provisions of the Account Agreement, "Customer [Mrs. Vierstra] agrees at all times to maintain such margin in [her] account as RJO may from time to time (in its sole discretion) require, and will meet all margin calls in a reasonable amount of time." (Account Agreement at ¶ 3, RJO Ex. Supp. Mot. Summ. J. at Tab 7.) For purposes of the Account Agreement, one hour is deemed a reasonable amount of time. (*Id.*) Further, "in the event that the account(s) have zero equity or is [sic] in deficit at any time, or in the event that RJO is unable to contact Customer due to Customer's unavailability . . . RJO shall have the right to liquidate all or any part of Customer's positions through any means available, without prior notice to the Customer." (*Id.*) Additionally, "RJO may require margin [in] excess of that required by applicable law, regulation, exchange or clearinghouse minimums." (*Id.*) "Customer understands that [she] is liable to RJO for any deficit ("debit") balance in the account . . . ." (*Id.* at ¶ 4.) Further, in the event RJO must take action to collect any unpaid debit balance, Customer "will reimburse RJO for all costs incurred, including reasonable attorneys' fees." (*Id.*). The Account Agreement also provides that "no provisions hereof shall in any respect be waived, augmented or modified by any other party unless in writing and signed by an official so authorized in RJO's office headquarters."

The Account Agreement further states that it is "subject to the constitution, regulations, customs, and interpretations of each exchange or market (and its clearing house, if any) on which trades are executed, and to all applicable governmental regulations." (*Id.* at ¶ 6.) This includes, but is not limited to, CME Rules, regulations promulgated by the Commodity Futures Trading

4

Commission ("CFTC"), and the Commodities Exchange Act, 7 U.S.C. § 1, *et seq.*

*The Account*

Through the Vierstra account, the Vierstras established "long" future positions in milk; "those positions are generally 'speculative' and represent a greater risk to a brokerage firm, such as RJO, than if [the Vierstras] were establishing 'short' positions as a 'hedge'." (RJO SUF ¶ 33.) As of June 11, 2001, the Vierstra account held "361 open positions in 'long' milk futures contracts which had been executed on the CME," (*id.* at ¶ 43), including open positions that expired the following February, March and April. Futures contracts expiring several months in the future are relatively illiquid. RJO deemed the Vierstras' open positions extremely risky; *e.g.*, the 361 open milk futures contracts held on June 11, 2001 could fall in value "as much as $1,083,000 in a single day." (*Id.* at ¶ 44.)

At the close of trading[1] on June 11, 2001, RJO issued a margin call for $132,015.31 on the 361 open "long" positions in the Vierstra account. At approximately 22:40 that night, RJO sent the Vierstras a daily account statement detailing the basis for the margin deficiency as well as the overall status of the Vierstra account.[2] The following morning, a few hours before milk futures trading commenced, the Vierstras received a margin call by telephone from Donna Heidkamp of RJO, who was the person at RJO principally responsible for the Vierstra account. During that conversation, Ms. Heidkamp told the Vierstras that "the only thing that would help toward the margin call would be wiring money or liquidating positions." (*Id.* at 50A.) Less than

---

[1] Milk futures traded on the CME from 09:40 to 13:10 CST.

[2] It was RJO's business practice to send the Vierstras an account statement each day by no later than 23:00 showing the activity in the account that day and the overall status of the account.

5

two hours later, a few minutes before the milk futures market opened, Ms. Heidkamp telephoned again, explaining to the Vierstras that RJO "really needs an answer whether you guys are wiring [money] or liquidating [positions]." (*Id.* at 53A.) Shortly thereafter, still needing an answer from the Vierstras, Ms. Heidkamp telephoned again and spoke with Mr. Vierstra, who instructed her to sell some of the long futures contracts because the Vierstras could not wire funds at that time. The calls to the Vierstras continued throughout the trading hours on June 12th, in part because Mr. Vierstra gave orders to sell contracts at "limit" prices which left RJO unable to sell: the "limit" prices he set exceeded that day's market prices. In a call to Mr. Vierstra at 10:23, Ms. Heidkamp informed him that if the Vierstras were unable to wire funds to cover the margin, RJO may require that "they try to get out of everything" and that they would need to "get out of about 200 contracts at least." (*Id.* at ¶ 56B-C). Shortly thereafter, Ms. Heidkamp informed Mr. Vierstra that RJO was unable to sell at the limit prices he had set, and that as a result, the Vierstra account could reach a deficit of nearly $1,000,000. Mr. Vierstra ultimately gave Ms. Heidkamp additional orders to liquidate the open long futures positions. As a result, RJO sold 35 of the open long milk futures contracts as well as 10 other milk futures contracts from the Vierstra account by the end of trading on June 12th. The account had a deficit balance of $107,039.48.

RJO's efforts to communicate with the Vierstras continued after the close of trading on June 12th. In addition to telephone calls, RJO faxed Mrs. Vierstra, notifying her that given the Vierstras' large position and the market activity that day, the required margin deposit was now $750,000,[3] reminding her that she had not yet committed to a way in which she could meet the

---

[3] At the close of trading on the 12th, the Vierstras needed to deposit $396,359.48 to meet the CME's *minimum* margin requirements. RJO set a larger margin because the Vierstras had not responded to the earlier margin call, the price of milk futures was volatile, the Vierstras held

6

margin obligations, and explaining that RJO would "take all necessary action to liquidate her account." (*Id.* at 67B.) Later that evening, a few minutes before 22:00, RJO e-mailed the Vierstras the daily account statement indicating a margin deficiency of approximately $717,800. The Vierstras discussed the margin call on the morning of June 13th, concluding that they needed to get money into the account in order to maintain it.

RJO tried to contact the Vierstras at least six times during the morning and early afternoon of June 13th with no success. By the time RJO spoke with Mr. Vierstra at just before 13:00, the milk futures price had dropped further, raising the margin requirements on the Vierstra account even higher. Less than fifteen minutes later, a telegram from RJO was delivered to the Vierstras, reminding them of the $717,800 margin call and stating that "the account may be liquidated at [RJO's] discretion without further notice." (*Id.* at ¶ 85B.) The Vierstras did not send funds to RJO on June 13th to meet the margin requirement.[4] During the course of trading on June 13th, RJO liquidated an additional 67 open long positions from the Vierstra account that day, leaving a deficit balance of $66,866.87 and a margin deficiency in excess of $1,000,000 based on RJO's margin requirements.

RJO sent Michael Burke to meet with the Vierstras in Twin Falls; Mr. Burke arrived in

---

a large position, and a large percentage of their holdings were in relatively illiquid "back month" contracts. The larger margin RJO set was actually $717,779.48 (not $750,000), as indicated in the daily account statement for June 12th.

[4]Mr. Vierstra sold some cattle on June 13th to raise some cash. The sales yielded $56,537.78. That money was not credited to the Vierstras' bank account until June 18th. The Vierstras also had other sources of cash, such as seeking an advance on the dairy's monthly milk production or accessing lines of credit. The Viertras did not pursue those options.

7

the afternoon of June 13th.[5] According to Mr. Vierstra, at 16:00 or 17:00 MST that day, Mr. Burke "verbally promised him that RJO would 'maintain' his account for 'six or eight days' if the Vierstras would sign a promissory note and give RJO approximately $130,000." (*Id.* at ¶ 95.) Later that evening, shortly after 19:30 and again shortly after 23:00, RJO e-mailed the Vierstras the daily account statement showing the number of positions sold that day and the revised margin deficiency. The following morning, the Vierstras met with Mr. Burke and signed a demand promissory note in the principal amount of $1,028,887.77 (the "Note"). The Note contains no reference to the existing open milk futures contracts in the Vierstra account, to the outstanding margin call, or to any agreement to forbear liquidation of the acccount or forbear collection of the margin and deficit balance. The Note refers to collateral, but does not specify what collateral backs the Note.

According to Mrs. Vierstra, Mr. Burke agreed that RJO would not sell the 259 remaining contracts and stated that RJO was "willing to take this [Note] to cover our margin and deficit because [RJO] knew there was no fundamental reason for the market decline and expected the market to rebound quickly."[6] (Mem. Opp. Mot. Summ. J., S. Vierstra Aff. at ¶ 2.) Mrs. Vierstra's understanding was that Mr. Burke was going to come to the dairy that afternoon to

---

[5]In its SUF, RJO contends that upon arriving in Twin Falls, Mr. Burke handed the Vierstras a daily account statement showing that day's trading activity and revised margin requirements. (RJO SUF at ¶ 94.) This fact is unsupported by the record, however, and therefore is not deemed admitted. Likewise, RJO's contentions that Mr. Burke (1) handed the same statement to Mr. Viestra on the morning of June 14th, (*id.* at ¶ 102), and (2) handed the Vierstras statements on both the 13th and 14th which warned of "future liquidations of the undermargined positions in their account," (*id.* at ¶ 114), are unsupported and therefore not deemed admitted.

[6]Although this statement was in Mrs. Vierstra's affidavit, it was not in the Vierstras' SDF, and thus is not deemed admitted by RJO.

8

discuss collateral for the Note and pick up money from the Vierstras. Sometime after the morning meeting, Mrs. Vierstra wrote a check to RJO for $100,000 at her husband's request;[7] Mr. Vierstra had not discussed giving RJO $100,000 (rather than $130,000) with Mr. Burke.

"After signing the [Note] but before delivering the $100,000 check and determining collateralization of the note, the Vierstras learned that [RJO] had . . . sold additional [milk futures] contracts," which the Vierstras considered a breach of their agreement. (Vierstras' SDF at ¶¶ 7-8.) As it turned out, RJO sold an additional 149 milk futures contracts from the Vierstra account during trading on June 14th, leaving a deficit balance of $50,232.67 and a margin deficiency of $523,252.67 according to RJO's margin requirements. After learning that RJO continued to sell their open positions, the Vierstras did not give Mr. Burke any money or discuss collateral for the Note.

The following day, June 15th, RJO liquidated the remainder of the Vierstra account after Ms. Heidkamp faxed the Vierstras with a revised margin call and expressly notified them that until the margin call was met, RJO would exercise its discretion to liquidate open positions. After liquidation, the Vierstra account had a deficit balance of $101,852.41.

RJO now seeks summary judgment against the Vierstras in the amount of that deficit balance, plus interest, attorneys' fees and costs.

Analysis

It is clear that under the terms of the Account Agreement, RJO had the right to make margin calls, RJO could require margins in excess of those required by the CME, Mrs. Vierstra

---

[7] There were insufficient funds in the Vierstras' bank account to cover the check at that time, but Mrs. Viestra attested that she had the necessary resources to deposit funds in the account to cover the check. (Vierstras' Mem. Opp. Mot. Summ. J., S. Vierstra Aff. at ¶ 9.)

had an obligation to meet such calls within a reasonable amount of time, and that in the event the Vierstra account was in deficit, RJO could exercise its discretion to liquidate the account. Given the terms of the Account Agreement, RJO contends that its liquidation of the Vierstra account after the Vierstras failed to meet margin calls was consistent with the Account Agreement, that the Vierstras are in breach of the Account Agreement for failure to pay the deficit balance due and owing on the account, and that RJO is entitled to judgment as a matter of law. The Vierstras, however, claim they reached an agreement with RJO through Mr. Burke under which RJO agreed not to further liquidate the account until June 20th, thus giving the Vierstras time for the market to rebound or to come up with the necessary money to maintain their positions. If there was such an agreement, the propriety of RJO's sales after that agreement are in question. Thus, the issue at the heart of this motion for summary judgment is whether RJO and the Vierstras modified the Account Agreement with a subsequent agreement. RJO contends that although it can prove no such modification agreement was ever made, the Vierstras' claim is inadequate as a matter of law and thus summary judgment is appropriate. Although some of RJO's arguments in support of its motion are flawed, its conclusion is correct.

RJO argues that the Vierstras may not introduce evidence of an oral agreement to modify the Account Agreement because the Account Agreement expressly requires any modification, waiver or amendment of its terms to be in writing. This argument is misplaced for two reasons. First, it is inaccurate. "[U]nder Illinois law, parties to a written contract may alter or modify its terms by subsequent oral agreement, even though the terms of the contract preclude oral modification." *A.W. Wendell & Sons, Inc. v. Qazi*, 626 N.E.2d 280, 287 (Ill. App. Ct. 1994); *Park v. Dealers Transit, Inc.*, 596 F.2d 203, 204 (7th Cir. 1979); *Czapla v. Commerz Futures,*

10

*LLC*, 114 F. Supp. 2d 715, 718 (N.D. Ill. 2000) (must show by clear and convincing evidence waiver of provision requiring writing). Second, the Vierstras do not argue that there was an oral modification, but rather, that there was an oral agreement subsequently reduced to a written agreement, *i.e.*, the Note.

RJO correctly points out that the Note "makes no reference whatsoever to margin, margin calls, or any agreement to refrain from liquidating the open positions in the Vierstras' account." (RJO Reply Br. at 8, n.6.) That is not dispositive, however. Despite RJO's argument to contrary, and despite the Vierstras' failure even to attempt to refute that argument, the Vierstras may be able to rely on parol evidence regarding the terms governing the Note. Under Illinois law, the parol evidence rule "generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify [a contract's] terms. Under the parol evidence rule, extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict a *fully integrated writing.*" *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 956 (Ill. App. Ct. 2001) (internal quotation marks and citations omitted). But if a contract is incomplete or ambiguous, *i.e.*, is not "clearly, on its face complete," the parol evidence rule does not bar a plaintiff from offering extrinsic evidence of additional, consistent terms. *Krautsack v. Anderson*, 768 N.E.2d 133, 146 (Ill. App. Ct. 2002); *Eichengreen*, 757 N.E.2d at 956. Courts determine from the four corners of the document whether a writing is fully integrated. *Krautsack*, 768 N.E.2d at 146. Here, there is a strong argument (not raised by the Vierstras) that the Note is *not* fully integrated. The Vierstras signed the Note "for value received"—but nowhere does the Note identify what value the Vierstras actually received. The Vierstras contend the value received was RJO's agreement to forbear collecting the margin and

11

deficit, which totaled $1,028,886.77—the amount of the Note.

Assuming *arguendo* that the Note is incomplete on its face, thus allowing extrinsic evidence of consistent terms, and further assuming that RJO's alleged agreement to forbear collection of the margin and deficit is consistent with the Note,[8] the Vierstras' claim that RJO breached their agreement nevertheless cannot succeed as a matter of law. Although the Vierstras discussed collateral for the Note with Mr. Burke, they admit that no agreement was ever reached regarding what collateral would be sufficient. The lack of agreement on collateral is fatal to the Vierstras' claim because it means the parties never reached an enforceable agreement.

Legally, RJO could not have agreed not to make a margin call.[9] 17 C.F.R. § 1.56(b)(3); *see also* CME Rule 930.E. But RJO could agree to extend a loan to the Vierstras to cover margin requirements as long as such loan was secured as defined in CFTC Regulation 1.17(c)(3).[10] CME Rule 930.G; 17 C.F.R. § 1.17(c)(3). CFTC Regulation 1.17(c)(3) provides, in relevant part, that a loan, advance or other receivable is considered secured if (1) "[t]he receivable is secured by readily marketable collateral which is otherwise unencumbered and which can be readily converted into cash" and (2) the clearing member has an enforceable written security agreement signed by the debtor as well as a perfected security interest in the readily marketable

---

[8]The court makes this assumption, rather than making a finding, because this issue was not directly briefed by the parties.

[9]Under CME Rules and CFTC Regulations, RJO was obligated to make margin calls to keep the account in compliance with the minimum margin requirements set by the CME, not to satisfy any heightened requirements set by RJO. *See* 17 C.F.R. § 1.56(b)(3); CME Rule 930.E.

[10]RJO's original contention that it cannot make a margin loan is false, as is the argument raised in its reply brief that the collateral had to be readily marketable *securities*. CFTC Regulation 1.17(c)(3) has no such requirement.

12

collateral. Adequate collateral (as defined by CFTC Regulation 1.17) is a prerequisite for an enforceable agreement regarding a margin loan. *See In re Chicago Discount Commodity Brokers, Inc.*, 58 B.R. 626, 630 (Bankr. N.D. Ill. 1986) ("If a contract is entered into in violation of statutory or regulatory law, it is unenforceable.") Unfortunately for the Vierstras, they never reached an agreement on the required collateral. Although they may have had an agreement to agree, that is not enough to create an enforceable contract.[11]

Because the Vierstras' claim regarding the Note and RJO's alleged forbearance agreement fails as a matter of law, the terms of the Account Agreement govern this action. It is undisputed that: (1) RJO made margin calls on the Vierstra account beginning on June 12th and continuing through June 15th; (2) the Account Agreement requires the Customer to meet all margin calls within a reasonable amount of time, and permits RJO to liquidate all or part of the account if the account is in deficit; (3) the Vierstras failed to meet any of the margin calls; (4) RJO liquidated the entire Vierstra account by June 15th, leaving a deficit balance of $101,852.41; and (5) under the terms of the Account Agreement, the Customer acknowledged liability for any deficit balance and agreed to reimburse RJO for all costs incurred relating to collection of a deficit balance, including reasonable attorneys' fees. Mrs. Vierstra executed the Account Agreement when she opened the Vierstra account, thus accepting its terms and conditions. Accordingly, the court grants summary judgment in favor of RJO and against Mrs. Vierstra for

---

[11]The Vierstras suggest that RJO's breach (continued liquidation of the milk futures contracts) excused their performance of tendering the money and collateral. That might be a viable argument had the parties actually reached an agreement regarding the collateral, but they did not. Consider, for example, the following: had the Vierstras and RJO discussed collateral on the afternoon of June 14th and discovered that the Vierstras were unable to offer any readily marketable collateral that met the requirements of CFTC Regulation 1.17(c)(3), RJO would not have had a breach of contract remedy—there simply would have been no contract.

the deficit balance on the Vierstra account of $101,852.41, plus interest, and reasonable costs and attorneys' fees.

The court denies RJO's motion for summary judgment against Mr. Vierstra, however. Although Mr. Vierstra was authorized to trade on the Vierstra account and respond to margin calls, Mr. Vierstra is not the Customer under the Account Agreement—in fact, his name appears nowhere in the document. RJO has failed to offer a sufficient legal basis for holding Mr. Vierstra liable.

## Conclusion

For the reasons set forth above, RJO's motion for summary judgment is granted with respect to Mrs. Vierstra but denied with respect to Mr. Vierstra. RJO may file a petition for fees and costs in accordance with the local rules of this district.

ENTER:

_____
JOAN B. GOTTSCHALL
United States District Judge

DATE: March 24, 2003

the deficit balance on the Vierstra account of $101,852.41, plus interest, and reasonable costs and attorneys' fees.

The court denies RJO's motion for summary judgment against Mr. Vierstra, however. Although Mr. Vierstra was authorized to trade on the Vierstra account and respond to margin calls, Mr. Vierstra is not the Customer under the Account Agreement—in fact, his name appears nowhere in the document. RJO has failed to offer a sufficient legal basis for holding Mr. Vierstra liable.

## Conclusion

For the reasons set forth above, RJO's motion for summary judgment is granted with respect to Mrs. Vierstra but denied with respect to Mr. Vierstra. RJO may file a petition for fees and costs in accordance with the local rules of this district.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATE: March 25, 2003